# JAMES J. DULL *et al.*

*v.*

# GEORGE R. BRAMHALL.

CONTRACT—*construction thereof.* A contractor who had engaged to construct a piece of work, employed another, at certain stipulated wages, to superintend the construction, having previously requested the latter to make the plans and devise the best means by which certain difficult parts of the work could be accomplished. After his employment, the superintendent, at the request of his employer, applied these plans in the execution of the work, which was successfully done.

*Held,* in an action against the contractor by his employee, to recover for the skill and labor bestowed in the making of those plans, that they were not embraced in the original contract of employment, nor in the duties thereby imposed, and he might recover additional compensation therefor.

APPEAL from the Superior Court of Chicago; the Hon. JOHN A. JAMESON, Judge, presiding.

This was an action of assumpsit, brought in the court below by Bramhall, against Dull & Gowan, to recover for work and labor. It appears that Dull & Gowan having taken the contract to construct the lake tunnel for the city of Chicago, engaged Bramhall, in December, 1863, to come to Chicago to work for them as a carpenter, to superintend the construction of the crib, at such reasonable wages as he should ask. He came in April, 1864, and commenced work at $4 per day. His wages were afterwards raised from time to time, at his suggestion. He continued to work as superintendent of the building of the crib till it was nearly completed, in the fall of 1864, and quit the employment of Dull & Gowan on the 3d of November, of that year, and went back to Pennsylvania. On December 12th, he returned to Chicago, and entered into the service of C. H. McCormick, as general superintendent of his reaper factory. In January following, Mr. Dull expressed a desire that Bramhall should return in the spring, and superintend the completion of the crib, which, on account of his engagement with McCormick, he declined to do, but recommended another man to fill his place. Mr. Dull also desired him to make plans for launching the crib and putting down large iron cylinders at the lake end of the tunnel, and show the new man where he left off in the construction of the crib. The crib had been constructed on the edge of a dock, and required to be launched after its completion, and towed out into the lake, and sunk at the extreme lake end of the tunnel. The cylinder was to be composed of sections of immense weight, which were to be united and sunk

within the hold of the crib, and form the inlet of the water into the tunnel, a new and difficult undertaking, for which the city furnished no plans.    During the winter, and while he was still in the service of McCormick, Bramhall employed his evenings in contriving and making the required plans, which were finally adopted by Dull & Gowan, in preference to plans of other persons (also submitted to them and the city's engineer), and used under the superintending direction of Bramhall with perfect success.    At the time of their adoption, April 8th, 1865, Bramhall entered in his book of accounts a charge of $500 for each plan.

Yielding to the earnest solicitation of Dull & Gowan, Bramhall went back into their service in the spring of 1865, at $6 per day, and was again placed in charge of the construction of the crib; and, when it was completed, executed the plans for the launching which he had made during the winter previous, and also that for putting down the cylinders.    While he was working upon the crib, Dull & Gowan having experimented with machinery, which they had contrived upon various plans furnished them by others, applied to Bramhall for some plan for putting screw anchors, which were to hold the crib in its place while being loaded with stone and sunk in its place in the lake.    This he undertook, bestowing his evenings upon it till he produced a plan which was adopted, and which accomplished the purpose; and, on the day the anchors were put down, entered in his book a charge for the making of these plans.    When the cylinders were being put down, some time in July, Bramhall told Gowan he had charged for the plans, and Gowan replied that, " when they got the work done they would pay him well for the plans." And again, in 1867, after Dull & Gowan had completed their contract, Dull promised " to pay well for the plans if they got their pay from the city, and would pay something anyway."    There was afterwards an attempt to settle the matter

for two hundred dollars, which failed because Mr. Gowan neglected to comply with his promise to pay that amount.

A trial resulted in a verdict for the plaintiff for $650, and judgment was entered accordingly. The defendants thereupon took this appeal, and ask a reversal on the ground that the services sued for were embraced in the duties of the plaintiff, as fixed in the original contract of employment, and they were not, therefore, liable to pay him extra compensation therefor.

Messrs. BATES & TOWSLEE, for the appellants.

Messrs. HURD, BOOTH & KREAMER, for the appellee.

Mr. CHIEF JUSTICE BREESE delivered the opinion of the Court:

The testimony in this case strongly preponderates in support of the verdict of the jury.

The important question was, did the plaintiff engage to furnish these ingenious plans for launching and anchoring the crib, when he engaged to take the superintendency of the work as a carpenter ?

We think it is clearly shown, that it was no part of his original employment or duty—it was extra work outside of the contract, and the plans were designed when he was not in the employment of the defendants, and for which he entered a charge in his book.

The plans were acknowledged to be very ingenious, and quite successful, giving evidence of such inventive genius as in most countries would have been attended by high honor and great reward.

The record cannot be read without coming to the conclusion that appellee worthily earned the pittance ($625) the jury gave him, and that it was extra work there can be no doubt.

HARVARD LAW SCHOOL LIBRARY

There is no question of law in the case. The qualification claimed by appellants to appellee's third and fourth instructions, fully appear in instructions two and six given for him, and in many of the instructions given for the appellants.

So far as the testimony can be said to be conflicting, the jury have reconciled it as best they could, and there is nothing in the case on which we could take hold, to disturb the verdict. So far as it goes, it does appellee but slight justice.

There being no error in the record, the judgment must be affirmed.

*Judgment affirmed.*